132 Nev., Advance Opinion 60

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| JAMES MCNAMARA,<br>Appellant,<br>vs.<br>THE STATE OF NEVADA,<br>Respondent. | No. 64403<br><br>**FILED**<br><br>AUG 1 2 2016<br><br>TRACIE K. LINDEMAN<br>CLERK OF SUPREME COURT<br>BY<br>CHIEF DEPUTY CLERK |

Appeal from a judgment of conviction, pursuant to a jury verdict, of first-degree kidnapping with substantial bodily harm and possession of a controlled substance. Eighth Judicial District Court, Clark County; Jessie Elizabeth Walsh, Judge.

*Affirmed.*

Philip J. Kohn, Public Defender, and Sharon G. Dickinson, Deputy Public Defender, Clark County,
for Appellant.

Adam Paul Laxalt, Attorney General, Carson City; Steven B. Wolfson, District Attorney, and Steven S. Owens, Chief Deputy District Attorney, Clark County,
for Respondent.

---

BEFORE HARDESTY, SAITTA and PICKERING, JJ.

*OPINION*

By the Court, PICKERING, J.:

NRS 171.020 governs Nevada's jurisdiction over crimes that straddle state lines. Here, we are asked to address whether Nevada had territorial jurisdiction over the crime of kidnapping with substantial bodily harm when the kidnapping and bodily harm originated in Illinois.

16-24996

We hold that Nevada had territorial jurisdiction over both the kidnapping charge and the substantial bodily harm enhancement. While the kidnapping began in Illinois, it continued into Nevada, where the kidnapper impeded the victim from seeking medical treatment for her injuries. Appellant's other assignments of error either lack merit or amount to harmless error.[1] We therefore affirm.

## FACTS

From December 2010 to February 2011, in the suburbs outside of Chicago, Kathryn Sharp resided with appellant James McNamara. The once-friendly and platonic relationship turned into an abusive one as McNamara began physically beating Sharp, isolating her from her friends and family, and threatening to torture and kill her family if she tried to leave. Beyond punches and kicks, McNamara beat Sharp with a metal baseball bat, a hammer, and other tools and household items—he even stabbed her with knives. The beatings with the metal baseball bat left open wounds on Sharp's legs, which became badly infected. McNamara would not let Sharp go to the hospital, nor did he allow her to freely shower. When she stated that she needed medical treatment, he grew angry and beat her. Without medical treatment, Sharp wrapped her legs with paper towels and duct-taped them to prevent the pus from the

---

[1]McNamara raises several other issues on appeal, challenging the sufficiency of the evidence, the admission of prior bad act evidence, denials of his motions for mistrial, the failure to gather evidence, refusal of his proposed jury instructions, the admission of Sharp's driver's license photo and McNamara's mug shot photo, the exclusion from evidence of Sharp's prior domestic abuse relationship, prosecutorial misconduct, violation of his speedy trial rights, the admission of bad act testimony during sentencing, and any cumulative error. We conclude McNamara's arguments are without merit and do not warrant discussion.

infections from leaking. The denial of medical treatment and the inability to shower exacerbated the infection in Sharp's legs—she testified, "my legs were so bad. I couldn't even put any weight on them the pain was so excruciating."

On February 13, 2011, Sharp and McNamara flew from Chicago to Las Vegas, where McNamara planned to visit his father. Sharp and McNamara stayed at the Circus Circus Hotel and Casino. Sharp was alone part of the time in Las Vegas—she went to the gift shop and buffet, and spent time in the room by herself. She testified, however, that she felt she could not safely escape without endangering herself and her family, whose lives McNamara had threatened. Although Sharp acknowledged at trial that McNamara was not physically violent with her in Las Vegas, McNamara continued to threaten her. While in Las Vegas, Sharp told McNamara she was in an enormous amount of pain because she did not have her normal painkillers with her and asked him if she could get medical treatment. McNamara became visibly upset when Sharp asked to go to the hospital and threatened to hurt her. Sharp retreated, saying that she was fine with Ibuprofen and did not need medical attention. However, McNamara told Sharp that he was going to beat her when he woke up from his nap. Knowing she needed medical treatment and in fear of another beating, Sharp escaped the hotel room and solicited help from hotel security who summoned an ambulance to take her to the hospital.

Once at the hospital, Sharp underwent extensive surgery on her legs. The surgeon at University Medical Center testified that her lower extremities evidenced repeated assaults over a long period of time and that the failure to seek medical treatment greatly exacerbated the

injuries and infection, which had to have caused "excruciating" pain. Sharp's infection was so extreme that she was lucky to be alive, much less save her legs from amputation. After surgery, Sharp had to get her dressings changed every day, which was a very painful experience.

While Sharp was at the hospital, the police arrested McNamara. On April 15, 2011, the State charged McNamara by way of information with kidnapping with substantial bodily harm, coercion, and possession of a controlled substance. After McNamara filed a pretrial petition for a writ of habeas corpus challenging the substantial bodily harm enhancement, the district court dismissed the enhancement, concluding that Nevada did not have territorial jurisdiction as all the physical violence occurred outside Nevada. Thereafter, the State obtained a grand jury indictment using different wording to support the substantial bodily harm enhancement. The grand jury indicted McNamara on one count each of first-degree kidnapping with substantial bodily harm and possession of a controlled substance. On May 31, 2013, the jury returned a guilty verdict on both counts. McNamara was sentenced to life without the possibility of parole.

## DISCUSSION

### Territorial jurisdiction

McNamara argues that Nevada lacked territorial jurisdiction to prosecute him for first-degree kidnapping with substantial bodily harm. McNamara's argument is three-fold. First, McNamara claims that he did not form any intent to kidnap in Nevada, which he contends NRS 171.020 requires. "By arguing the kidnapping was an on-going event beginning in Illinois," McNamara posits, the "State admitted [McNamara] did not form intent in Nevada." Second, McNamara argues that the aggravated charge of first-degree kidnapping with substantial bodily harm cannot be

sustained because Sharp conceded that McNamara never physically hurt her in Las Vegas, only in Illinois, which he claims vitiates the substantial bodily harm enhancement. Third, McNamara argues that the district court erred in failing to submit the issue of territorial jurisdiction to the jury.

*Proving territorial jurisdiction under NRS 171.020*

Territorial jurisdiction has long been required in criminal cases. First, territorial jurisdiction was a creature of common law and the prosecution had the burden to affirmatively prove that the crime "was committed within the territorial jurisdiction of the court and grand jury where the indictment was found." *People v. Gleason*, 1 Nev. 173, 178 (1865); *see also People v. Betts*, 103 P.3d 883, 886-86 (Cal. 2005) ("At common law, courts applied a narrow principle of territorial jurisdiction in criminal cases and, with some exceptions, a particular crime was viewed as occurring for purposes of jurisdiction in only one location, conferring jurisdiction over the offense upon only a single state. . . . Like most other states, California has addressed the problem of criminal activity that spans more than one state by adopting statutes that provide our state with broader jurisdiction over interstate crimes than existed at common law."). However, the Nevada Legislature modified the common-law rule by enacting NRS 171.020 to address territorial jurisdiction in the context of interstate crimes.

NRS 171.020 provides:

Whenever a person, with intent to commit a crime, does any act within this State in execution or part execution of such intent, which culminates in the commission of a crime, either within or without this State, such person is punishable for such crime in this State in the same manner as if the

Supreme Court
of
Nevada

(O) 1947A

same had been committed entirely within this State.

"The language of the statute gives jurisdiction to Nevada courts whenever the criminal intent is formed and *any act* is accomplished in this state in pursuance or partial pursuance *of the intent.*" *Shannon v. State*, 105 Nev. 782, 792, 783 P.2d 942, 948 (1989). Prior to *Shannon*, this court had interpreted NRS 171.020 narrowly because it worried that a broad interpretation would impose "upon the sovereignty of a sister state." *Id.* at 791, 783 P.2d at 947. However, after "the United States Supreme Court ha[d] ruled, under the dual sovereignty doctrine, that successive prosecutions by two states for the same conduct are not barred by the double jeopardy clause of the Fifth Amendment," this court reversed course and held "that NRS 171.020 should be given the full interpretation intended by the Nevada Legislature." *Id.* at 791, 783 P.2d at 948. Thus, this court interpreted NRS 171.020 "not [to] require that there be partial execution of the actual crime" within Nevada, but rather that NRS 171.020 "only requires some carrying out of the criminal intent" within Nevada. *Id.* at 792, 783 P.2d at 948.

McNamara interprets NRS 171.020 and *Shannon* to require that a defendant *form* his or her criminal intent in Nevada *plus* accomplish any act in furtherance of that intent in Nevada. Nothing in the plain language of NRS 171.020 or the holding in *Shannon* requires that the intent be formed in Nevada. Rather, Nevada courts obtain territorial jurisdiction whenever (1) a defendant has criminal intent (irrespective of where it was formed) and (2) he or she performs any act in this state in furtherance of that criminal intent. The broad language of NRS 171.020 demonstrates a legislative objective to confer territorial jurisdiction over crimes having a sufficient connection to Nevada. *Cf.*

*People v. Renteria*, 82 Cal. Rptr. 3d 11, 17 (Ct. App. 2008) (discussing Cal. Penal Code § 778a(a) (West 2008), which is similar to NRS 171.020, and concluding that "[t]he ultimate question is whether given the crime charged there is a *sufficient connection* between that crime and the interests of the State of California such that it is reasonable and appropriate for California to prosecute the offense" (emphasis added)); *State v. Legg*, 9 S.W.3d 111, 112 (Tenn. 1999) (holding that Tennessee had territorial jurisdiction over an aggravated kidnapping charge even though the kidnapping and physical violence took place in Alabama).

As kidnapping is a continuing crime, *see* 51 C.J.S. *Kidnapping* § 3 (2010) ("Kidnapping, which involves the detention of another, is, by its nature, a continuing crime. . . . The span of the kidnapping or confinement begins when the unlawful detention is initiated and ends only when the victim both feels and is, in fact, free from detention."); *see also Smith v. State*, 101 Nev. 167, 169, 697 P.2d 113, 115 (1985) (holding that "when a defendant commits criminal acts in Nevada which are a substantial and integral part of an overall continuing crime plan," Nevada courts have jurisdiction under NRS 171.020), jurisdiction over McNamara was proper for the charge of kidnapping because, when McNamara forced Sharp to remain with him against her will, the kidnapping continued into Nevada's territorial jurisdiction until such time that Sharp felt and was, in fact, free from detention.[2]

---

[2]McNamara's reliance on *Fortner v. Superior Court*, 159 Cal. Rptr. 3d 128 (Ct. App. 2013), is misplaced. *Fortner* involved a domestic battery that took place while a couple was on vacation in Hawaii—specifically a "single punch to [the victim]'s face." *Id.* at 131-32. Once home in California, the prosecution charged the defendant for said offense. *Id.* at 131. The California Court of Appeal granted the defendant's motion to

*continued on next page...*

*Substantial bodily harm enhancement*

McNamara argues that Sharp's concession that McNamara "never hit her and never forced her to have sex while in Nevada" demonstrates that Nevada lacked territorial jurisdiction over the substantial bodily harm enhancement. The substantial bodily harm enhancement rendered McNamara eligible for life without the possibility of parole, whereas first-degree kidnapping without substantial bodily harm carries the possibility of parole. NRS 200.320. The State counters that McNamara prevented Sharp from receiving medical treatment while in Las Vegas, which constitutes substantial bodily harm because it made her endure prolonged physical pain.

"Substantial bodily harm" is defined as "(1) Bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ; or (2) Prolonged physical pain." NRS 0.060. Delayed medical treatment can cause "prolonged physical pain, thereby falling within the definition of substantial bodily harm." *Rice v. State*, 113 Nev. 1300, 1310, 949 P.2d 262, 268 (1997), *abrogated on other*

---

*...continued*
dismiss the Hawaii-related offense for lack of territorial jurisdiction because the prosecution failed to present any evidence that tied the offense to California. *Id.* at 134. We are presented with a different situation here. Not only is the continuing nature of kidnapping distinct from a single punch to one's face, but our statutes provide different jurisdictional rules for kidnapping than battery or domestic violence. *Compare* NRS 200.350(1) ("Any proceedings for kidnapping may be instituted either in the county where the offense was committed or in any county through or in which the person kidnapped or confined was taken or kept while under confinement or restraint."), *with* NRS 200.485, *and* NRS 200.481(1).

*grounds by Rosas v. State*, 122 Nev. 1258, 147 P.3d 1101 (2006); *see Collins v. State*, 125 Nev. 60, 64, 203 P.3d 90, 92-93 (2009) (defining "prolonged physical pain" in broad terms to "encompass some physical suffering or injury that lasts longer than the pain immediately resulting from the wrongful act," but noting that "by its very nature, the term 'pain' is necessarily subjective and cannot be defined further"); *see also LaChance v. State*, 130 Nev., Adv. Op. 29, 321 P.3d 919, 925 (2014) (upholding substantial bodily harm enhancement for battery charge "based on prolonged physical pain" where the victim "testified that she was immobile for a few days afterward and that her injuries have resulted in permanent shin splints, which prevent her from running . . . [and her] injuries to her tailbone hinder her ability to sit for long periods").

In this case, McNamara restricted Sharp from seeking medical treatment, both before and after they came to Las Vegas. The forced delay in obtaining medical attention caused the infections in Sharp's legs to worsen, creating excruciating pain and hindering her ability to put weight on her legs. These untreated injuries required Sharp to undergo extensive surgery, necessitating several weeks of painful follow-up at the hospital. Because McNamara's prevention of Sharp seeking medical treatment in Nevada caused prolonged physical pain, Nevada had jurisdiction over the substantial bodily harm enhancement.

*Procedure for establishing territorial jurisdiction*

Citing *Gleason*, 1 Nev. 173, McNamara argues that the district court was required to instruct the jury on territorial jurisdiction and the State needed to prove jurisdiction beyond a reasonable doubt. McNamara points out that "*Shannon* did not overrule *Gleason*," rendering *Gleason*'s reasonable doubt standard of proof for territorial jurisdiction controlling. We disagree. While McNamara is correct that *Shannon* did not overrule

Supreme Court
of
Nevada

(O) 1947A

*Gleason*, *Gleason* is inapplicable because it interpreted the common law, which the Legislature abrogated with the passage of NRS 171.020 in 1911 and subsequent amendment in 1927. *See* 1927 Nev. Stat., ch. 64, § 59a, at 87.

Our prior decisions make clear that territorial jurisdiction is a question of law reserved for the court. *See Shannon*, 105 Nev. at 791, 783 P.2d at 948 (concluding that territorial jurisdiction involves "a question of law to be decided by the court, not to be submitted to a jury"). Yet, this court has not expressly articulated the burden of proof to establish territorial jurisdiction and there is a split of authority on this issue.

Some jurisdictions require proof beyond a reasonable doubt when determining territorial jurisdiction. Typically, these courts reason that territorial jurisdiction is an essential element of the crime charged, invoking the State's burden to prove each element beyond a reasonable doubt. *See, e.g., Ortiz v. State*, 766 N.E.2d 370, 374 (Ind. 2002) ("Territorial jurisdiction . . . is not necessarily thought of as an element of the offense. Nonetheless, we have determined that the State is required to prove territorial jurisdiction beyond a reasonable doubt. This is so because where the law has established the necessity of a certain fact for an accused to be guilty of an offense, the existence of that fact is treated much like an element of the offense." (citation and internal quotation marks omitted)); *State v. Rimmer*, 877 N.W.2d 652, 661 (Iowa 2016) (stating that "territorial jurisdiction is an essential element of the crime" (internal quotation marks omitted)). Other courts that have required proof beyond a reasonable doubt to prove territorial jurisdiction have reasoned that the question of jurisdiction involves factual disputes best suited for the jury. *See, e.g., Khalifa v. State*, 855 A.2d 1175, 1185 (Md.

2004) ("Territorial jurisdiction is a factual issue for the trier of fact. When the issue is in dispute, the State has the burden to prove 'beyond a reasonable doubt' that the crime was committed within the geographic limits of Maryland." (citation omitted)); *State v. Batdorf*, 238 S.E.2d 497, 502-03 (N.C. 1977) ("[W]hen jurisdiction is challenged, as here, the State must carry the burden and show beyond a reasonable doubt that North Carolina has jurisdiction to try the accused.").

Nevertheless, albeit in a roundabout way, our prior decisions indicate that the preponderance of the evidence standard applies when pleading and proving territorial jurisdiction in criminal cases. The analysis begins with *Walstrom v. State*, where this court held that the State's burden of proof for an exception to the statutes of limitation was the preponderance of the evidence standard and reasoned:

> The lesser standard is appropriate because proving the application of the exception to the statute is not the same as proving an element of the crime. Proving the exception to the statute of limitations addresses the issue of the court's jurisdiction; proving an element of the crime concerns the issue of a defendant's guilt or innocence. *The considerations that require proof beyond a reasonable doubt do not apply when the State is merely attempting to prove jurisdiction.* Given the difficulty of proving the secret manner exception long after the commission of an offense, we see no sound reason to compound the difficulty by imposing a higher standard upon the State.

104 Nev. 51, 54-55, 752 P.2d 225, 227-28 (1988) (emphasis added), *overruled in part by Hubbard v. State*, 112 Nev. 946, 920 P.2d 991 (1996). *Hubbard* retreated from *Walstrom*, concluding that *Walstrom*'s holding "that statutes of limitation are jurisdictional and that they may be raised as a bar to prosecution at any time" went against the weight of authority

of other jurisdictions and, thus, because "statutes of limitation in criminal cases are non-jurisdictional, affirmative defenses[, they] must be raised in the trial court or they are waived." 112 Nev. at 948, 902 P.2d at 992. In *Dozier v. State*, though, this court recognized that *Hubbard* focused on the issue of waiver, but did not discuss *Walstrom*'s holding that the State's burden of proof for statutes of limitation is preponderance of the evidence and was confronted with addressing the appropriate burden of proof. 124 Nev. 125, 129, 178 P.3d 149, 152 (2008). This court held:

> We now clarify that despite our holding in *Hubbard II* that the statute of limitations is an affirmative, non-jurisdictional defense, the State's burden of proof is still governed by the preponderance of the evidence standard . . . . In addressing the State's burden to disprove an affirmative defense that negates an element of a criminal offense, this court has held that the State has the burden to disprove the defense beyond a reasonable doubt. As we explained in *Walstrom*, however, an affirmative defense asserting that the prosecution is barred by the statute of limitations does not involve an element of the offense implicating the defendant's guilt or innocence.

*Id.* at 129-30, 178 P.3d at 152-53 (footnote omitted). After reviewing jurisdictions that apply proof beyond a reasonable doubt to statutes of limitation, this court rejected that reasoning because "[t]he statute of limitations is not an element of the offense that the State should be required to prove beyond a reasonable doubt." *Id.* at 131, 178 P.3d at 154. Thus, *Dozier* revived the reasoning in *Walstrom* that a preponderance of the evidence standard applies to issues not involving the defendant's guilt or innocence or an element of the criminal offense. *Id.*

After reviewing these cases in light of *Shannon*, we hold that the State need only prove territorial jurisdiction by a preponderance of the



evidence. *Shannon* made clear, "whether NRS 171.020 allows Nevada jurisdiction over crimes occurring in another state is a question of jurisdiction, *not an element of the crime charged.*" 105 Nev. at 791, 783 P.2d at 948 (emphasis added). As such, because jurisdiction does not involve an element of the crime charged or relate to the defendant's guilt or innocence, under the reasoning in *Walstrom* and *Dozier*, territorial jurisdiction need not be proven beyond a reasonable doubt. *See, e.g.*, *United States v. White*, 611 F.2d 531, 535 (5th Cir. 1980) ("If the Government shows by a preponderance of the evidence that the crime was committed in the trial district, both territorial jurisdiction and proper venue are established."); *Betts*, 103 P.3d at 893 ("The prosecution has the burden of proving the facts necessary to establish territorial jurisdiction by a preponderance of the evidence."); *State v. Holm*, 137 P.3d 726, 749-50 (Utah 2006) (discussing Utah Code Ann. § 76-1-501(3) (LexisNexis 2012) and concluding that "[t]he jurisdiction determination is a matter for the trial court, not the jury, and the court itself must resolve any associated factual disputes by a preponderance of the evidence").

For much the same reason, we also reject McNamara's argument that the failure to submit the question of territorial jurisdiction to the jury violated his Sixth Amendment rights as articulated in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). In *Apprendi*, the Supreme Court invalidated a hate-crime sentence enhancement because the statute allowed the trial judge to effectively increase a defendant's sentence if, by a preponderance of the evidence, the trial judge found that the defendant's possession of a firearm was "with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity." *Id.* at 469 (quoting former N.J. Stat. Ann.

§ 2C:44-3(e) (West 1999)). Recognizing the "with a purpose" requirement inherently involved a determination of the defendant's mens rea, the Court stated that "[t]he defendant's intent in committing a crime is perhaps as close as one might hope to come to a core criminal offense 'element.'" *Id.* at 493. This led the Court to ask, "Despite what appears to us the clear 'elemental' nature of the factor here, the relevant inquiry is one not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Id.* at 494. Answering that question in the affirmative, the Court observed that a trial judge's finding of a hate crime by a preponderance of the evidence had the potential to increase the defendant's sentence from 10 to 20 years. *Id.* at 495. Thus, the Court held, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490.

Notably, the Supreme Court did not discuss procedural issues, such as jurisdiction. And courts deciding issues of territorial jurisdiction post-*Apprendi* have found *Apprendi* inapplicable to territorial jurisdiction challenges. *See, e.g., Betts*, 103 P.3d at 892 (distinguishing *Apprendi* and noting that "territorial jurisdiction is a procedural matter that relates to the authority of California courts to adjudicate the case and not to the guilt of the accused or the limit of authorized punishment, [and thus] a jury trial on the factual questions that establish jurisdiction is not required by the federal Constitution"); *see also United States v. Miguel*, 338 F.3d 995, 1004 (9th Cir. 2003) ("*Apprendi* does not require a jury find the facts that allow the transfer to district court. The transfer proceeding establishes the district court's jurisdiction over a defendant."); *United*

*States v. Ford*, 270 F.3d 1346, 1347 (11th Cir. 2001) ("*Apprendi* claims are not jurisdictional."). Thus, the district court is not required to submit territorial jurisdiction to the jury and it may decide any factual disputes concerning jurisdiction by a preponderance of the evidence.

In this case, the parties disputed factually whether territorial jurisdiction was proper. McNamara argues that the issue of territorial jurisdiction should have been submitted to the jury under the reasonable doubt standard. However, the issue of territorial jurisdiction in this case *was* submitted to the jury to determine beyond a reasonable doubt. The district court instructed the jury on territorial jurisdiction using the language of NRS 171.020:

> Whenever a person, with intent to commit a crime, does any act within this State in execution or part execution of such intent, which culminates in the commission of a crime, either within or without this State, such person is punishable for such crime in this State in the same manner as if the same had been committed entirely within this State. Nevada has jurisdiction over such a continuing offense only when the criminal intent is formed and any act is accomplished in this state in pursuance or partial pursuance of the intent. It is not required that there be partial execution of the actual crime; it only requires some carrying out of the criminal intent.

The jury was not told that it need only find territorial jurisdiction proper by a preponderance of the evidence. Instead, the jury was instructed solely on the reasonable doubt standard. Thus, in finding McNamara guilty of first-degree kidnapping with substantial bodily harm, the jury resolved the factual disputes regarding territorial jurisdiction by a standard higher than this court requires today. And although the district court failed to formally acknowledge, as a matter of law, that territorial

jurisdiction was proper, any such error was harmless because the State proffered extensive testimony that the kidnapping continued into Nevada and, while McNamara did not physically abuse Sharp in Nevada, he impeded her from seeking medical treatment, which exacerbated her injuries and caused her excruciating and prolonged pain. Therefore, Nevada had territorial jurisdiction over McNamara with regard to the charge of first-degree kidnapping with substantial bodily harm.

*Notice of grand jury proceedings*

McNamara argues that the State failed to give him proper notice of the grand jury proceedings because the amount of time was not reasonable as he had less than one-day's notice of the actual time, date, and place of the grand jury proceedings. The dates of the notice are as follow:

- *Nov. 8, 2011*: State sent defense counsel notice of intent to seek indictment via fax to the public defender's office.
- *Nov. 14, 2011*: Defense counsel sent letter to State, indicating he received notice and requesting notification of date, time, and place of the proceedings.
- *Nov. 16, 2011*: Unaware of defense counsel's letter, State sent defense counsel an email following up to ask whether McNamara planned to testify or defense counsel had any exculpatory evidence for it to present.
- *Nov. 16, 2011*: Defense counsel responded via email, explaining that he already sent a letter requesting the date, time, and place of the grand jury proceedings.
- *Nov. 16, 2011, 3:49 p.m.*: State faxed defense counsel a letter with the date, time, and place of the proceedings, and requested any exculpatory evidence.

SUPREME COURT
OF
NEVADA

(O) 1947A

- *Nov. 17, 2011*: Grand jury proceedings were scheduled to be held, in which the State allotted a testify-time for McNamara at 4:30 p.m.
- *Nov. 17, 2011, 3:57 p.m.*: After receiving no response after State's notice of date, time, and place, State emailed defense counsel, asking whether he planned to come to grand jury proceedings.
- *Nov. 17, 2011, 5:07 p.m.*: After the grand jury proceedings, State emailed defense counsel stating, "You and your client did not appear. The grand jury deliberated and returned a true bill. The indictment will be returned tomorrow at 11:45 in DC 7."

NRS 172.241 provides in part that a district attorney need only provide notice of its intent to seek indictment at least five judicial days before the grand jury:

> 1. A person whose indictment the district attorney intends to seek or the grand jury on its own motion intends to return, but who has not been subpoenaed to appear before the grand jury, may testify before the grand jury if the person requests to do so and executes a valid waiver in writing of the person's constitutional privilege against self-incrimination.
>
> 2. A district attorney or a peace officer shall serve reasonable notice upon a person whose indictment is being considered by a grand jury unless the court determines that adequate cause exists to withhold notice. *The notice is adequate if it:*
>
> (a) Is given to the person, the person's attorney of record or an attorney who claims to represent the person and *gives the person not less than 5 judicial days to submit a request to testify to the district attorney*; and
>
> (b) Advises the person that the person may testify before the grand jury *only if the person submits a written request to the district attorney* and includes an address where the district attorney may send a notice of the date, time and

Supreme Court
OF
Nevaoa

(O) 1947A

17

place of the scheduled proceeding of the grand jury.

(Emphases added.)

Here, the district attorney complied with NRS 172.241(2) because it faxed its grand jury notice to the public defender's office on November 8, which gave McNamara over five judicial days to submit a written request. *See Davis v. Eighth Judicial Dist. Court*, 129 Nev. 116, 120, 294 P.3d 415, 418 (2013) (holding that fax notice of intent to seek indictment was sufficient and such notice need not include the date, time, and place of the grand jury hearing). Though defense counsel sent a letter to the State, it was not received until the next day. The following day, the State provided defense counsel with the statutorily required information, including date, time, and place of the scheduled grand jury proceedings.

McNamara argues that a one-day notice of the date, time, and place of the grand jury proceedings is unreasonable, citing *Sheriff v. Marcum*, 105 Nev. 824, 783 P.2d 1389 (1989). However, *Marcum* held that a one-day notice was unreasonable regarding notice of whether the State intended to seek an indictment, not necessarily notice of the date, time, and place of the grand jury proceedings. *Id.* at 827, 783 P.2d at 1391. *Marcum* analyzed then-NRS 172.241, which did not include the five-day notice provision as exists today. *Id.* at 826, 783 P.2d at 1390 ("We note that although both NRS 172.095(1)(d) and NRS 172.241 give a defendant the right to testify before a grand jury, both statutes are silent regarding a defendant's right to have notice of the grand jury proceedings at which he may be indicted." (footnotes omitted)). In response to *Marcum*, the Legislature amended NRS 172.241 to include a five-day notice provision of the State's intent to seek an indictment, requiring the defense to submit a written request for the date, time, and place. *See*

Hearing on S.B. 82 Before the Assembly Judiciary Comm., 66th Leg. (Nev., May 30, 1991); *see also* 1997 Nev. Stat., ch. 99, § 1, at 188. Thus, the State complied with NRS 172.241 and McNamara failed to show how the State's notice was unreasonable.

*Verdict form did not include second-degree kidnapping*

McNamara argues that his conviction must be reversed because the district court failed to include the lesser offense of second-degree kidnapping on the verdict form. Both parties and the district court agreed to include second-degree kidnapping on the verdict form. The district court instructed the jury on second-degree kidnapping:

INSTRUCTION NO. 11

You are instructed that if you find that the State has established that the defendant has committed first degree kidnapping you shall select first degree kidnapping as your verdict. The crime of first degree kidnapping may include the crimes of second degree kidnapping. You shall find the defendant guilty of second degree kidnapping if:

(1) You have not found, beyond a reasonable doubt, that the defendant is guilty of first degree kidnapping, and

(2) All twelve of you are convinced beyond a reasonable doubt the defendant is guilty of the crime of second degree kidnapping.

If you are convinced beyond a reasonable doubt that the crime of kidnapping has been committed by the defendant, but you have a reasonable doubt whether such kidnapping was of the first or of the second degree, you must give the defendant the benefit of that doubt and return a verdict of kidnapping of the second degree.

INSTRUCTION NO. 12

A person who willfully and without authority of law seizes, inveigles, takes, carries away or kidnaps another person with the intent to

SUPREME COURT
OF
NEVADA

(O) 1947A

19

keep the person secretly imprisoned within the State, or for the purpose of conveying the person out of the State without authority of law, or in any manner held to service or detained against the person's will, is guilty of kidnapping in the second degree.

Despite the agreement to include second-degree kidnapping on the verdict form and the instructions allowing the jury to consider second-degree kidnapping as a lesser offense, the district court mistakenly gave the jury a verdict form that did not include second-degree kidnapping. McNamara did not review the verdict form before it was given to the jury because he claims that the district court "is the last person handling jury instructions and verdict forms." Neither party disputes that McNamara was entitled to an instruction on second-degree kidnapping. Rather, the issue is whether the district court's mistake in failing to include second-degree kidnapping on the verdict form is reversible error. We conclude that it is not reversible error.

If a district court properly instructs the jury on the lesser-included offenses, it is not reversible error if the lesser-included offenses are omitted from the verdict form. *See State v. St. Clair*, 16 Nev. 207, 212 (1881); *People v. Osband*, 919 P.2d 640, 683-84 (Cal. 1996). In *St. Clair*, the district court gave the jury a verdict form that included only first- and second-degree murder but omitted the lesser-included offenses of manslaughter and justifiable homicide. 16 Nev. at 212. As here, the district court did instruct the jury on all of the lesser-included offenses. *Id.* The court found no reversible error occurred:

Upon these facts it is clear, to our minds, that the jurors were not misled, as claimed by appellant's counsel, into the belief that if they found defendant guilty they were confined in their deliberations, as to the degree of guilt, to the two

> degrees of murder. It was their duty, if they believed, from the evidence, that the defendant was guilty of any offense (and they were so instructed), to determine the degree of guilt from the evidence adduced at trial. The forms were merely given as a guide to the jury in framing their verdict, and were not intended, and could not have been considered, to limit the right of the jury to a consideration of the defendant's guilt to the two degrees of murder.

*Id.* The California Supreme Court came to the same conclusion: "any failure to provide a form, if error it is, results in no prejudice when the jury has been properly instructed on the legal issue the trial presented." *Osband*, 919 P.2d at 683-84. The court in *Osband* relied on *People v. Hill*, 48 P. 711, 713 (Cal. 1897), for the following statement:

> Where, therefore, the jury has been properly instructed as to the different degrees of the offense, it must be presumed that, if their conclusion called for a form of verdict with which they were not furnished, they would either ask for it, or write one for themselves. It certainly could have no necessary tendency to preclude them from finding such verdict.

Thus, the court in *Hill* concluded that there was "no reversible error in the record." *Id.* *But see Wilson v. State*, 566 So. 2d 36, 37 (Fla. Dist. Ct. App. 1990) (concluding that "[a] verdict that is not in conformance with the jury instructions is clearly defective," and reversing the conviction because the district court did not include the lesser charge of "robbery" and only included "robbery with a firearm" on the verdict form, even though both offenses were in the jury instructions). While we recognize McNamara's citation to *Wilson*, which is equally as analogous to this case as *St. Clair*, we are not bound by the Florida District Court of Appeal. Thus, under Nevada precedent, the district court did not commit reversible error.

Here, like *St. Clair*, the district court properly instructed the jury on first- and second-degree kidnapping but failed to include second-degree kidnapping in the verdict form. Although this omission was an error, it does not constitute a reversible error as per the reasoning in *St. Clair*, but is rather a harmless error, to which McNamara did not object.

Jurors are presumed to follow the instructions they are given. *See Leonard v. State*, 117 Nev. 53, 66, 17 P.3d 397, 405 (2001). Here, the jury was instructed that they must find the defendant guilty of each element of first-degree kidnapping to convict him of this offense. The jury made an affirmative finding that the defendant was guilty of first-degree kidnapping when they signed and returned their verdict to that effect. Had they not found McNamara guilty of first-degree kidnapping, their choice was to sign and return the not guilty form, to question the verdict form, or to amend it to find him guilty of second-degree kidnapping. Finally, the evidence supporting the first-degree kidnapping conviction was overwhelming and the district court individually polled the jurors. *See People v. Jimenez*, 217 P.3d 841, 869-70 (Colo. App. 2008) (rejecting defendant's claim that error on verdict form, which did not include a "not guilty" box for the lesser-included offense of second-degree murder, required reversal, observing "that the court polled the jurors after they returned their verdicts, and all of them affirmatively indicated that they had found defendant guilty of second-degree murder. Thus, we need not guess whether the jury's verdict accurately reflected its collective conclusion concerning defendant's guilt or innocence of second-degree murder."). *Cf. Bohrer v. DeHart*, 961 P.2d 472, 477 (Colo. 1998) ("We defer

to jury verdicts when jurors have been properly instructed and the record contains evidence to support the jury's findings."). Therefore, while the omission of the lesser-included offense of second-degree kidnapping was in error, it did not constitute reversible error.

## *CONCLUSION*

We hold that territorial jurisdiction is proper when a defendant has criminal intent and he or she performs any act in this state in furtherance of that criminal intent. Territorial jurisdiction is a question of law for the court to decide, not the jury. The State bears the burden of proving territorial jurisdiction by a preponderance of the evidence. In this case, territorial jurisdiction was proper as the State proved by a preponderance of the evidence that McNamara continued the crime of first-degree kidnapping into Nevada and his prevention of Sharp from receiving medical treatment caused her prolonged physical pain, warranting the substantial bodily harm enhancement to his kidnapping charge. Although the district court committed two errors—the failure to conclude as a matter of law whether it had territorial jurisdiction and the inadvertent use of the incorrect verdict form, we conclude such errors were harmless. McNamara's other claims on appeal are meritless and do not warrant a new trial. Thus, we affirm the judgment of conviction.

_____, J.
Pickering

We concur:

_____, J.
Hardesty

_____, J.
Saitta